IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 21, 2026, in Knoxville

## STATE OF TENNESSEE v. TRAVARIUS DEWAYNE HOUSTON

**Appeal from the Criminal Court for Davidson County**
**No. 2024-D-2529    Steve R. Dozier, Judge**
_____

**No. M2025-00826-CCA-R3-CD**
_____

After a bench trial, the trial court convicted the Defendant, Trevarius Dewayne Houston, of two counts of assault against a law enforcement officer, one count of retaliation for past action, one count of theft of merchandise, and one count of resisting arrest. The trial court sentenced the Defendant to serve a total effective sentence of two years, suspended to a year of probation. On appeal, the Defendant asserts that: (1) the evidence is insufficient to support his convictions; and (2) the State committed prosecutorial misconduct during closing argument. After review, we reverse the trial court's judgments in Count 1 and Count 3 and affirm the remaining judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in part; Reversed in Part and Remanded**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Martesha Johnson, Public Defender, Ellison Berryhill, Assistant Public Defender (on appeal), Kaylee Kohlmaier and Raven Otey, Assistant Public Defenders (at trial), Nashville, Tennessee, for the appellant, Travarius Dewayne Houston.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General; Joshua R. Gilbert, Assistant Attorney General (pro hac vice); Glenn R. Funk, District Attorney General; and Chantley T. Frazier, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## I. Facts

This case arises from a dispute over a theft at a gas station market on July 27, 2024. The Defendant, who had been drinking that night, entered the store during the early

morning hours and accused the store clerk of stealing his wallet and phone. While in the store, he took a beer from the cooler and drank it, knowing that he did not have a wallet to pay for the beer. Most of the Defendant's charges stemmed from his interaction with the law enforcement officer who was called to the scene. A Davidson County grand jury indicted the Defendant for two counts of assault against a law enforcement officer, a Class E felony, one count of retaliation for past action, a Class E felony, one count of theft of property, a Class A misdemeanor, one count of criminal impersonation, a Class B misdemeanor, and two counts of resisting arrest, a Class B misdemeanor.

At trial, the parties presented the following evidence: Malek Boles, a Trinity Market employee, was working on July 27, 2024, when the Defendant entered the store and told Mr. Boles that he had left his phone in the store and asked if someone had stolen it. Mr. Boles told the Defendant that he had not brought a phone into the store with him. The Defendant then said, "I want a beer now." Mr. Boles informed the Defendant that they were no longer selling beer since it was after 3:00 a.m., but the Defendant proceeded to the cooler anyway. The Defendant took a beer from the cooler and drank it without paying. Mr. Boles estimated that the beer cost $2.59 before tax. The Defendant did not attempt to or offer to pay for the beer.

Mr. Boles asked the Defendant to leave the store, and he refused. The Defendant told Mr. Boles to call the police, so he did. The police arrived approximately twenty minutes later. Mr. Boles said that he showed the police officer the surveillance footage from the store and the officer "saw everything."

On cross-examination, Mr. Boles agreed that the Defendant had been in the store three to four hours before the incident and purchased "Chore Boy or something like that." Mr. Boles agreed that the Defendant did not attempt to leave the store but chose to wait for the police to arrive. Mr. Boles confirmed that he did not save the video surveillance footage of the Defendant in the store.

Metro Nashville Police Department officer Christopher Cantrell responded to a request for police assistance with a theft at the Trinity Market. Officer Cantrell spoke with Mr. Boles and the Defendant upon arrival. Mr. Boles showed Officer Cantrell surveillance footage of the Defendant. The footage showed the Defendant entering the store and walking toward the back left of the store to the alcohol coolers. The Defendant took a beer from the cooler, consumed it and then left the store without paying. The Defendant then re-entered the store and attempted to go to the cooler to get another beer, and the employees intervened.

Officer Cantrell described his observations of the Defendant as "excited, belligerent, [and] a little verbally combative." The Defendant complained that he was missing his

2

wallet and his cell phone. He denied having anything to do with taking a beer. When asked for his name, the Defendant provided a false name, "Houston, Dwayne." The Defendant gave his birth date and tried to give the officer a business card, but Officer Cantrell declined to take the business card. Officer Cantrell said that the Defendant smelled of alcohol and appeared to be intoxicated. Based upon his own observations and what he viewed on the surveillance footage, Officer Cantrell arrested the Defendant. In a search incident to arrest, Officer Cantrell found the Defendant's wallet, which contained bank cards and "other documents" with the name "Travarius Houston" rather than the name he had provided to Officer Cantrell. Officer Cantrell was able to confirm the Defendant's identity through the name on the bank cards.

Officer Cantrell testified that while he was attempting to search the Defendant, the Defendant began to yell insults at the officer. He then proceeded to "violently" jerk his right shoulder back toward the officer, requiring Officer Cantrell to use physical force to place the Defendant back against the police vehicle to continue his protective search. Officer Cantrell believed that the Defendant was trying to "elbow strike" him. The Defendant shouted insults at the officer, and, at one point, he turned his head and "intentionally spit" in the officer's face. This was the Defendant's first assault on the officer. Officer Cantrell finished his search and placed the Defendant in the back seat of the patrol car where he continued to shout at the officer and spit at him.

The Defendant threatened to "run up on you hoes," referencing the officers at the scene. On the drive to booking, the Defendant stated that he and his friend were "going to run up on [Officer Cantrell]." Officer Cantrell said that this threat was not clear on the recording but that you could hear Officer Cantrell's response. Officer Cantrell said that he sought clarification with the Defendant, asking, "are you threatening me." The Defendant responded, "I am threatening you, yes." The State then played footage from Officer Cantrell's body camera.

The footage showed the Defendant waiting inside, at the door of the market. The officer asked the employees what occurred. The employee had some difficulty explaining in English what had occurred but said that the Defendant had been smoking ("shit") and accused the employee of stealing the Defendant's food. The employee said that the Defendant then walked to the cooler and took out a beer. When the employee explained to the Defendant that he could not purchase the beer because it was after 3:00 a.m., the Defendant drank the beer. In speaking with the officer, the employee also accused the Defendant of hitting another employee. The Defendant responded that he bought cigarettes in the store and denied drinking the beer. Officer Cantrell asked to see the surveillance footage. The owner entered to show the police officer the surveillance video and appeared to say that whatever theft the Defendant claimed occurred outside. Officer Cantrell asked the Defendant's name and he said, "Houston, Dewayne," confirming the spelling with the

3

officer. He then provided his birth date and his phone number. On the video recording, he repeatedly claimed that "somebody took [my] stuff," but was largely ignored.

The body camera footage showed the owner and employee taking turns trying to find the correct footage on a cell phone. The footage on the owner's cell phone is not visible in the bodycam footage. The employee told the officer that the Defendant hitting the employee cannot be seen on the footage because of the camera angles. Officer Cantrell turned to arrest the Defendant, and the employee asked, "Do you want to see him touches [sic] the beer?" The officer responded, "he already admitted it." Officer Cantrell then told the Defendant that the video validated everything the employee and owner accused the Defendant of doing. Throughout the exchange, the Defendant repeatedly asked, "how can I pay if you have my wallet?" He told the owner and employee, "I can pay for it. You have my wallet." A woman in the store offered to pay. It is unclear, but it appeared the owner agreed to allow the woman to pay for the beer.

The video showed Officer Cantrell walk the Defendant out of the market toward his police car and search the Defendant at the rear of the car. Officer Cantrell then moved the Defendant to the front of the car. The Defendant was clearly agitated and yelling and cursing at the officer. The officer placed the Defendant up against the front of the car to continue his search and then told the Defendant to stop pulling away. The Defendant responded, "I ain't pulling away from you but I'm gonna turn around so you can see me in the face." The Defendant also yelled at a bystander who was filming the incident. As he yelled at the bystander, the officer interrupted, asking, "Did you just spit on me?" and then "Yes, you did." The Defendant responded, "I didn't." Officer Cantrell grabbed the Defendant and walked him to the back of the car. The Defendant continued to yell at the bystander and the officer. As the Defendant yelled, Officer Cantrell stated, "You are still spitting on me." The officer placed the Defendant in the backseat of the cruiser. As he tried to shut the car door, the Defendant, who was still yelling at the bystander and/or the officer, appeared to block the door with his foot. Officer Cantrell screamed at the Defendant to "stop" and shut the car door. Officer Cantrell then asked the bystander who was recording, "did I spit on you?" and she answered in the negative.

The body camera footage showed the Defendant seated in the backseat while the officer, seated in the driver's seat, filled out paperwork. The Defendant commented on Officer Cantrell's conversation with another officer. The officers appeared to be mostly ignoring the Defendant, but the officer in the window smiled and chuckled following some of the Defendant's statements. At one point, the Defendant stated, "I'mma run it on you hoes. I know what it looks like." He then said for the officers to go ahead and illegally record him so he can "run it on you bitches" in court. The final clip was taken during the transport to booking. It is not clear if the Defendant was responding to something or the statement was spontaneous, but referencing the body camera recording, the Defendant

4

stated, "I didn't assault you yet." The officer asked, "What does that mean?" The following exchange occurred:

Defendant:          I didn't assault you.
Officer:            Does that mean you plan to do it later?
Defendant:          I didn't assault you.
Officer:            You said I didn't assault you yet.
Defendant:          I didn't assault you.
Officer:            Does that mean you are planning to assault me?
Defendant:          I didn't assault you.
Officer:            But are you planning to?
Defendant:          I didn't assault you.
Officer:            Ok, I was just checking.
Defendant:          Thank you. I didn't assault you.
Officer:            Because it sounds like you are planning to assault me.

There was silence for a short period and then the Defendant started speaking again but much of it is inaudible on the recording. At one point the officer stated, "Sounds like you're threatening me. That's what it sounds like. I'm just trying to clarify." The officer then said, "You are threatening me?" And the Defendant responded, "I am threatening to make sure you lose your job." The officer said, "Ok. Ok. Alright, just wanted to make sure because that's a felony."

Defendant:   No, it's not.
Officer:     It is.
Defendant:   It's not.
Officer:     It is.
Defendant:   I'm not threatening to hurt you, I'm threatening to make sure
             you lose your job. Because you should.

The recording ended at that point.

On cross-examination, Officer Cantrell agreed that the "store managers" fast forwarded through portions of the video and "pann[ed] to different spots" and that he did not watch the "video in full." He also agreed that the video did not have audio. He confirmed that he observed the Defendant drink the beer on the video recording but that he was not there during the incident so had no personal knowledge of whether the Defendant attempted to pay for the beer. Officer Cantrell agreed that the Defendant was compliant while he was speaking with him inside the store. Although, the Defendant provided the name "Houston, Dwayne," Officer Cantrell was able to confirm that the Defendant provided his correct birth date and phone number. Officer Cantrell agreed that the

Defendant offered him a business card but that he declined to take it because he "didn't need it."

Officer Cantrell agreed that the Defendant did not resist while he was being handcuffed or while being walked to the police car. He agreed that as he went through the Defendant's pockets, the Defendant began yelling at Officer Cantrell and a bystander at the gas station. Officer Cantrell moved the Defendant to the front of the car where the Defendant did not attempt to take steps away from the officer but was "turning his body." Officer Cantrell agreed that the Defendant was not trying to swat his hands away or anything of that nature. He confirmed that he was still able to search the Defendant despite the Defendant turning to face Officer Cantrell.

Officer Cantrell agreed that the Defendant sat in the car and did not resist or kick at the officer. He explained that the Defendant placed his foot on the door to prevent Officer Cantrell from closing the car door. Officer Cantrell placed the Defendant's leg in the car, and the Defendant did not resist.

Officer Cantrell agreed that the Defendant was yelling at the time the spitting occurred. He conceded that the Defendant did not collect spittle in his mouth and then lodge it at the officer and that the spit was coming out of the Defendant's mouth as he was yelling at the bystander and Officer Cantrell. Officer Cantrell said that "it is the manner in which [the Defendant was] moving his mouth while he's screaming and saying things to intentionally cause spit to come out of his mouth." He explained that he believed it was intentional because at other points in his interactions with the Defendant, spit did not come out of his mouth. He again agreed that "spit [was] just coming out of his mouth while he [was] yelling."

Officer Cantrell agreed that the Defendant did not make any direct threats of physical harm. He said that the Defendant talked "nonstop" in the back of the patrol car and that much of it did not make sense. The officer agreed that the Defendant stated, "I'm not threatening to hurt you." Officer Cantrell stated that he was never provided the surveillance video footage from the market.

The Defendant testified that he preferred to go by his last name and had done so since his freshman year in college. He explained that he had not gone by "Travarius" since before "intermediate school" because it was so often mispronounced, so he began going by "Dwayne" until college.

The Defendant recalled the events that led to his arrest. He entered the market on Trinity Lane to purchase tobacco products. He stated that only he and two clerks were in the store. After speaking with the clerk at the counter, he learned that the coolers were still

6

unlocked, and even though it was after 3:00 a.m., he could still buy beer. He paid for the cigarillos and then showed the clerk his identification. He left his phone and wallet on the counter while he walked back to the cooler to get a beer. He did not see any signs indicating that he could not buy beer due to the hour. When he returned to the front, one of the clerks stepped in front of him to block him from approaching the counter, while the other clerk picked up the Defendant's phone and wallet and exited the store.

The Defendant put the beer on the counter and ran to the door to try to catch the clerk who took his phone and wallet. The clerk who had blocked the Defendant pressed a button to lock the door, preventing the Defendant from exiting. The Defendant began arguing with the remaining clerk, and the clerk told the Defendant to leave. The Defendant refused to leave until his items were returned. The clerk threatened to call the police, and the Defendant told him, "please do." The Defendant listened as the clerk called the police and asserted that the Defendant was "eating our food and drinking our beer and he's assaulting people." The Defendant denied eating any food and said that he attempted to pay for the beer. The Defendant waited for the police to arrive.

When the police arrived, the Defendant did not have identification to show the police officer because his wallet had been stolen. He provided "Houston" as his name and followed up with "Dwayne," spelling both for the officer. He also provided the officer with his birth date and his phone number. Although the Defendant no longer had his identification, he did try to give the officer a business card, but the officer declined to take it.

The police officer watched surveillance video footage. The Defendant assumed it was the entire recording but later learned, the police officer just viewed "one clip." Thus, he was surprised when the officer told him he was under arrest, but he complied. The police officer told the Defendant that the video showed him committing all the things - eating food, drinking beer, and assaulting people - the clerk accused him of doing. The Defendant maintained, "None of that happened." The Defendant asked, "can I pay cash for the beer?" The police officer patted down the Defendant inside the store and then walked the Defendant out to his police vehicle where he searched the Defendant, first at the back of the car and then the front. As the officer searched him, the Defendant was yelling. At times, the Defendant would try to face the officer. He explained that normally he faced whomever he was speaking to, so his turning was "a natural reaction." He denied that he turned with the intention of spitting on the officer. He stated that he did not at any time try to flee or prevent the officer from searching him.

After the search, the officer told the Defendant to get inside the back of the patrol car. As he did so, he rolled his ankle. He said that he used his leg to push himself the rest of the way into the car because his hands were behind his back. He said the officer assisted

7

him with getting in the car and then fastened the seat belt for him. He denied that he ever tried to exit the car or was squirming away from the officer as he fastened the seat belt.

The Defendant denied that he intentionally spit on the officer at the front of the car. The Defendant explained that there was a bystander recording the interaction, and he responded to things the bystander was saying. He was also speaking to the officer and responding to what the officer was saying to him. He agreed that it was "possible" that spit came out of his mouth as he was yelling but that he was not intentionally trying to spit on the officer. At the rear of the vehicle, the Defendant continued to yell, and the officer told him, "you are still spitting on me." The Defendant maintained that he was yelling and not trying to spit on the officer.

About the threats, the Defendant explained that when he said something along the lines of it "is going to take more than two of y'all," he meant that it would take more than two officers to complete their bad arrest. By this point in the incident, the Defendant was already in the car, so he could not have been referring to needing more officers to detain him. The other comment, "I'm going to run it on you hoes," meant that he was going to follow up on the officer's misconduct. He believed his arrest was wrongful and that he would be able to show that in court. He denied that either statement was a threat to harm the officer.

The Defendant acknowledged that he was drunk at the time of these events so some of what he said was "drunk talk," but he maintained that he never intended nor did he ever threaten to assault or physically harm the officer. He did say "I haven't assaulted you yet," but then quickly followed up with "I haven't assaulted you," multiple times to clarify. The officer asked the Defendant if he was threatening the officer and the Defendant responded, "I am threatening to make sure that you lose your job." The Defendant said that was "drunk talk." He explained, "Is he actually going to lose his job? No. But I am going to follow up. And I said that and I meant that."

On cross-examination, the Defendant admitted that, earlier that night, he and a friend had been "downtown," he had two single shots of tequila and one double shot. The Defendant denied drinking the "Clubtail" beer. The Defendant agreed that on the surveillance video, he offered to pay for the beer. When asked if he only had .23 cents on him, he said that he believed he had more but did not know what had happened to his cash.

On cross-examination, the Defendant stated that he had intended to use "the same card" he had used to purchase the cigarillos, to purchase the beer; however, his wallet was gone when he returned to the counter.

Upon questioning by the trial court, the Defendant said that the clerk who took the Defendant's wallet and phone did not return to the store. He said that the owner was not in the store at the time the Defendant entered but that he arrived at the store after the police were called to show the officers the footage on his cell phone.

After hearing this evidence, the trial court convicted the Defendant of two counts of assault on an officer based upon extremely offensive contact, one count of resisting arrest, one count of retaliation for past actions, and one count of theft under $1000. The trial court acquitted the Defendant of one count of resisting arrest, and one count of criminal impersonation. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the evidence is insufficient to support his convictions and that the State committed prosecutorial misconduct during closing argument. The State asks us to affirm the trial court's judgments in all respects.

### A. Sufficiency of the Evidence

The Defendant maintains that the evidence is insufficient to support any of his convictions. He admits that he "behaved inappropriately" but that his behavior did "not rise to the level necessary to convict" the Defendant of the charges. In his brief, however, the Defendant does not make any argument as to the theft conviction; thus, our review will cover the four remaining convictions.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon

direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

The Defendant was convicted of five of the seven indicted charges against him. Except for the theft conviction, we will address each criminal offense for which he was convicted in turn.

### 1. Assault Against a Law Enforcement Officer

The Defendant was convicted of two counts of assault against a law enforcement officer based upon two incidents of the Defendant spitting on the officer. The first occurred

at the front of the police cruiser as the officer attempted to search the Defendant. The second incident occurred shortly thereafter as the Defendant was placed in the rear of the police cruiser. The Defendant asserts that his act of spitting inadvertently, as he was yelling at a bystander, is not sufficient evidence that his conduct was "knowing." The State responds the Defendant's conduct "clear[ly]" "escalated from offensive insults to the officer to spitting on the officer," in violation of Tennessee code Annotated section 39-13-116.

To sustain a conviction for assault on a law enforcement officer, the State had to prove that Defendant "knowingly cause[d] physical contact with a law enforcement officer, . . . , and a reasonable person would regard the contact as extremely offensive or provocative, including, but not limited to, spitting, throwing, or otherwise transferring bodily fluids, bodily pathogens, or human waste onto the person of a . . . law enforcement officer" when the officer was "discharging or attempting to discharge" their official duties. T.C.A. § 39-13-116(a)(2).

Our criminal code provides that:

'[k]nowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

T.C.A. § 39-11-302(b).

In our view, there is insufficient evidence in the record to establish that Defendant acted "knowingly" with respect to the first count of assault on a law enforcement officer. The video footage showed that, as the officer searched the Defendant, the Defendant was yelling at a bystander. The Defendant was yelling, non-stop, the entire time. He never paused to draw in and collect spittle in his mouth to spit at the officer. The video does not show any transfer of spit from the Defendant to the officer. The officer interrupted the Defendant's yelling, saying, "Did you just spit on me? Yes, you did." To which, the Defendant responds, "I didn't." A reasonable inference from this proof is that, during the exchange with the bystander, spittle inadvertently struck the law enforcement officer leaving the Defendant entirely unaware he had spit on the officer (Count 1). There is no proof in the record indicating that Defendant was aware that his yelling at a bystander was "reasonably certain" to cause physical contact with Officer Cantrell that was extremely offensive or provocative. However, once the officer made the Defendant aware that his conversation with the bystander resulted in the Officer being spat upon, the Defendant continued yelling at the bystander and the officer, thereby spitting on the officer again

11

(Count 2). The officer stated to the Defendant, "You're still spitting on me." Thus, the Defendant's conduct as to Count 2 constitutes knowing physical contact with the officer because the Defendant was aware, whether inadvertent or not, that his dialogue with the bystander was causing spittle to land on the officer.

Accordingly, we conclude that the evidence is insufficient to sustain the Defendant's conviction as to Count 1 of assault on a law enforcement officer, but we affirm his conviction in Count 2.

### 2. Retaliation for Past Actions

The Defendant asserts that he never threatened to harm Officer Cantrell but that his statements were in relation to what the Defendant believed to be a wrongful arrest. The State responds that "[a]ny rational trier of fact would have convicted the defendant for retaliation based on the defendant's threatening Officer Cantrell."

The trial court convicted the Defendant of retaliation for past action based on his statements to Officer Cantrell during the arrest. As charged in this case, the State was required to prove that the Defendant "[threatened] to harm a witness at an official proceeding . . . by any unlawful act in retaliation for anything the witness . . . did in an official capacity as witness[.]" T.C.A. § 39-16-510(a)(1) (2014). Tennessee law defines "official proceeding" as "any type of administrative, executive, legislative or judicial proceeding that may be conducted before a public servant authorized by law to take statements under oath[.]" *Id*. §39-11-106 (2014)[1].

Here, the officer was in the process of arresting the Defendant when the Defendant made several comments toward the officer such as, "It's going to take more than two of ya'll" and "I'm going to run up on you hoes." While it is questionable whether these statements constitute an articulable threat of harm, we conclude that an arrest is not an official proceeding as defined by statute. The Sentencing Commission Comments state that this statute "protects jurors, judges and witnesses at official proceedings from any sort of retaliation undertaken as a result of their official actions." Because the Defendant was in the process of an arrest, and an arrest is not an official proceeding, this statute is inapplicable to the conduct charged. *See State v. Tharpe*, No. W2022-01219-CCA-R3-CD, 2023 WL 7448749, at *1 (Tenn. Crim. App. November 9, 2023) (defendant threatened police officer in retaliation for his preliminary hearing testimony); *State v. Whitaker*, No. E2014-01066-CCA-R3-CD, 2015 WL 1454544, at *1 (Tenn. Crim. App. March 27, 2015)

---

[1] In 2025, the legislature amended this section to read: "A person commits an offense who harms or threatens to harm an individual involved in the judicial process or a family member of such person with the intent to impede, intimidate, interfere with, or retaliate against the individual in connection with the individual's participation in the judicial process."

(defendant threatened to kill the witness for appearing in court to testify against him). Therefore, we vacate this judgment.

### 3. Resisting Arrest

The Defendant asserts that he did not resist arrest but that he fell while trying to enter the patrol vehicle. The Defendant argues the trial court's finding that he resisted is inconsistent with his entire course of conduct. The State responds that the evidence was sufficient to support this conviction. We agree with the State.

The State was required to show that the Defendant, "intentionally prevent[ed] or obstruct[ed] [Officer Cantrell] from effecting a stop, frisk, halt, arrest or search[.]" T.C.A. § 39-16-602 (2025)

The video footage showed that the Defendant extended his foot, blocking the car door, while entering the patrol vehicle. Officer Cantrell verbally corrected the Defendant and then physically moved the Defendant's foot inside the vehicle. This is sufficient evidence upon which the trier of fact could find, beyond a reasonable doubt, that the Defendant intended to hinder the officer's progress with the arrest. The Defendant is not entitled to relief as to this issue.

In summary, we affirm the Defendant's convictions for theft, one count of assault, and for resisting arrest. We vacate the judgments for one count of assault and for retaliation for past action.

### B. Prosecutorial Misconduct

The Defendant asserts that, during closing argument, the State misrepresented the evidence, thereby committing prosecutorial misconduct. The Defendant concedes that he did not make a contemporaneous objection but asks this court to grant relief pursuant to plain error.

During closing argument, the prosecutor stated, "[Officer Cantrell], at another instance, responds: Did you just spit on me again?" The prosecutor argued that this statement showed further proof that the Defendant intentionally spat on Officer Cantrell. The Defendant contends that Officer Cantrell actually stated, "you're still spitting on me." He asserts that the State's version of the officer's statement "is materially different."

The Defendant's failure to object to the State's argument at trial precludes our review of this issue, subject to our noticing "plain error." *See* Tenn. R. App. P. 3(e) (providing that "no issue presented for review shall be predicated upon error in the

13

admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in the motion for new trial. . . .); Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (stating that failure to object to prosecutor's alleged misconduct in closing argument waives any later complaint).

This Court has, in its discretion, from time-to-time reviewed allegations of prosecutorial misconduct as "plain error" even in the absence of a contemporaneous objection. *See, e.g., State v. Marshall*, 870 S.W.2d 532 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Carter*, 988 S.W.2d 145 (Tenn. 1999) (determining in absence of objection that prosecutor's jury argument was not plain error); *State v. Butler*, 795 S.W.2d 680 (Tenn. Crim. App. 1990) (considering whether statements of prosecutor were plain error despite lack of objection by defendant); *Anglin v. State*, 553 S.W.2d 616 (Tenn. Crim. App. 1977) (determining that in order to justify reversal on the basis of improper argument and remarks of counsel in absence of objection, it must affirmatively appear that the improper conduct affected the verdict to the prejudice of the defendant).

Pursuant to Rule 36(b) of the Tennessee Rules of Appellate Procedure, "when 'necessary to do substantial justice,' this Court has the authority to 'consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.'" *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). We refer to this discretionary consideration of waived issues as "plain error" review. *Id*. (citing *Grindstaff v. State*, 297 S.W.3d 208, 219 n.12 (Tenn. 2009)).

When considering whether "plain error" exists, we consider the following factors: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting the test articulated by the Court of Criminal Appeals in *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established by the record before an appellate court will recognize the existence of "plain error," and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Id*. In addition, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642.

"Courts have recognized that closing argument is a valuable privilege afforded to the State and the defense and have afforded wide latitude to counsel in arguing their cases to the jury." *State v. Cleveland*, 959 S.W.2d 548, 551 (Tenn. 1997) (citing *State v. Bigbee*, 885 S.W.2d 797, 809 (Tenn. 1994)). We have recognized five general areas of prosecutorial misconduct: (1) intentionally misstating the evidence or misleading of the jury on the inferences it can draw; (2) expressing personal beliefs or opinions; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) adding outside issues to the guilt or innocence issue; and (5) arguing or referring to outside facts. *State v. Goltz*, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003).

Having reviewed the closing argument in its entirety, we conclude that plain error review is not warranted. The prosecutor's comment does not constitute a breach of the wide latitude afforded during closing arguments. The body camera footage was played for the trial court during the bench trial. The State's remark during closing argument cannot be said to be of such a great magnitude that the inclusion of the statements "probably changed the outcome of the trial." The Defendant is not entitled to relief on this issue.

### III. Conclusion

After careful review of the record, we conclude that there is insufficient evidence to support Count 1, assault on a law enforcement officer and Count 3, retaliation for past actions. Therefore, those two judgments are vacated. We affirm the remaining judgments.

_____s/ *ROBERT W. WEDEMEYER*_____
ROBERT W. WEDEMEYER, PRESIDING JUDGE

15